MARGARET A. MOESER, Acting Chief
Money Laundering and Asset Forfeiture Section (MLARS)
MARY BUTLER, Chief, International Unit
JONATHAN BAUM, Senior Trial Attorney
BARBARA Y. LEVY, Trial Attorney
JOSHUA L. SOHN, Trial Attorney
SEAN M. FERN, Trial Attorney
Criminal Division
United States Department of Justice
  1400 New York Avenue, N.W. 10th Floor
  Washington, D.C. 20530
  Telephone:  (202) 993-4834
  Email:  Sean.Fern@usdoj.gov

Attorneys for Plaintiff
UNITED STATES OF AMERICA

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>ONE DRAWING ENTITLED "TROIS FEMMES NUES ET BUSTE D'HOMME" BY PABLO PICASSO, AND ALL FUNDS AND ASSETS, INCLUDING SECURITIES AND INVESTMENTS, ON DEPOSIT IN ONE SWISS BANK S.A. ACCOUNT NUMBER '5470,<br><br>Defendants. | No. CV<br><br>**VERIFIED COMPLAINT FOR FORFEITURE *IN REM***<br><br>[18 U.S.C. § 981(a)(1)(A) and (C)]<br><br>[F.B.I.] |

The United States of America (the "Government") brings this complaint against the above-captioned assets and alleges as follows:

## PERSONS AND ENTITIES

1.    The plaintiff is the United States of America.

2.     The defendants in this action (together, the "DEFENDANT ASSETS") consist of:

a.     One pencil on paper drawing entitled "Trois Femmes Nues et Buste D'Homme" by Pablo Picasso, more particularly described in Attachment A ("**THE TROIS FEMMES NUES DRAWING**"), and

b.     All funds and assets, including securities and investments, on deposit in ONE Swiss Bank S.A., account number ending in 5470, held in the name of Glen Vine Partners Limited in Switzerland, more particularly described in Attachment B ("**THE GLEN VINE ACCOUNT**").

3.     The person and entity known to the United States whose interests may be affected by this action are "Jasmine" LOO Ai Swan ("LOO") and Glen Vine Partners.

4.     Plaintiff has previously filed the following related complaints, seeking civil forfeiture of the following assets (collectively, the "SUBJECT ASSETS"):

a.     Case number CV 16-5362 DSF (PLAx), *United States v. The Wolf of Wall Street Motion Picture, Including any Rights to Profits, Royalties and Distribution Proceeds owed to Red Granite Pictures, Inc. or its Affiliates and/or Assigns* ("**THE WOLF OF WALL STREET**").

b.     Case number CV 16-5368 DSF (PLAx), *United States v. The Real Property Known as The Viceroy L'Ermitage Beverly Hills (*"**THE L'ERMITAGE PROPERTY**").

c.     Case number CV 16-5369 DSF (PLAx) *United States v. All Business Assets of The Viceroy L'Ermitage Beverly Hills, Including All Chattels and Intangible Assets, Inventory, Equipment, and All Leases, Rents and Profits Derived Therefrom* ("**THE L'ERMITAGE BUSINESS ASSETS**").

d.     Case number CV 16-5377 DSF (PLAx) *United States v. Real Property located in Beverly Hills, California* ("**HILLCREST PROPERTY 1**").

e.     Case number CV 16-5371 DSF (PLAx) *United States v. Real Property Located in New York, New York* ("**PARK LAUREL CONDOMINIUM**").

f.      Case number CV 16-5367 DSF (PLAx) *United States v. One Bombardier Global 5000 Jet Aircraft, Bearing Manufacturer's Serial Number 9265 and Registration Number N689WM, its Tools and Appurtenances, and Aircraft Logbooks* (**"BOMBARDIER JET"**).

g.      Case number CV 16-5374 DSF (PLAx) *United States v. Real Property Located in New York, New York* (**"TIME WARNER PENTHOUSE"**).

h.      Case number CV 16-5378 DSF (PLAx) *United States v. Real Property located in Los Angeles, California* (**"ORIOLE MANSION"**).

i.      Case number CV 16-5375 DSF (PLAx) *United States v. Real Property Located in New York, New York* (**"GREENE CONDOMINIUM"**).

j.      Case number CV 16-5364 DSF (PLAx) *United States v. Any Rights to Profits, Royalties and Distribution Proceeds Owned by or Owed to JW Nile (BVI) Ltd., JCL Media (EMI Publishing Ltd), and/or Jynwel Capital Ltd, Relating to EMI Music Publishing Group North America Holdings, Inc., and D.H. Publishing L.P., Inc. and D.H. Publishing L.P.* (**"EMI ASSETS"**).

k.      Case number CV 16-5370 DSF (PLAx) *United States v. All Right to and Interest in Symphony CP (Park Lane) LLC, Held or Acquired, Directly or Indirectly, by Symphony CP Investments LLC and/or Symphony CP Investments Holdings LLC, Including Any Interest Held or Secured by the Real Property and Appurtenances Located at 36 Central Park South, New York, New York, Known as The Park Lane Hotel, Any Right to Collect and Receive Any Profits and Proceeds Therefrom, and Any Interest Derived From the Proceeds Invested in The Symphony CP (Park Lane) LLC by Symphony CP Investments LLC and Symphony CP (Park Lane) LLC* (**"SYMPHONY CP (PARK LANE) LLC ASSETS"**).

l.      Case number CV 16-5376 DSF (PLAx) *United States v. United States v. Real Property Located in New York, New York* (**"WALKER TOWER PENTHOUSE"**).

m.     Case number CV 16-5379 DSF (PLAx) *United States v. Real Property located in Beverly Hills, California* (**"LAUREL BEVERLY HILLS MANSION"**).

n.     Case number CV 16-5366 DSF (PLAx) *United States v. one pen and ink drawing by Vincent Van Gogh titled "La maison de Vincent a Arles"* (**"VAN GOGH ARTWORK"**).

o.     Case number CV 16-5366 DSF (PLAx) *United States v. One painting by Claude Monet titled "Saint-Georges Majeur"* (**"SAINT GEORGES PAINTING"**).

p.     Case number CV 16-5366 DSF (PLAx) *United States v. €25,227,025.83 Euros held in an escrow account at UBS, S.A. in Switzerland constituting the proceeds of the sale of a painting by Claude Monet titled "Nympheas"* (**"PETITE NYPMHEAS PROCEEDS"**).

q.     Case number CV 16-5380 DSF (PLAx) *United States v Real Property in London, United Kingdom, owned by Qentas Holdings* (**"THE QENTAS TOWNHOUSE"**).

r.     Case number CV 17-4240 DSF (PLAx) *United States v. Real Property in London, United Kingdom owned by Stratton Street (London) Ltd.* ("**THE STRATTON PENTHOUSE**").

s.     Case number CV 17-4242 DSF (PLAx) *United States v. Real Property in London, United Kingdom owned by Seven Stratton Street (London) Ltd.* (**"STRATTON FLAT"**).

t.     Case number CV 17-4244 DSF (PLAx) *United States v. Real Property in London, United Kingdom owned by Eight Nine Stratton Street (London) Ltd.* (**"STRATTON OFFICE BUILDING"**).

u.     Case number CV 17-4438 DSF (PLAx) *United States v. Certain rights To and Interests In The Viceroy Hotel Group.* (**"THE VICEROY HOTEL GROUP ASSETS"**).

1        v.    Case number CV 17-4439 DSF (PLAx) *United States v. All rights To and Interests In The Motion Pictures "Daddy's Home" and "Dumb and Dumber To," Belonging to red Granite Pictures.* **("DUMB AND DUMBER TO RIGHTS" and "DADDY'S HOME RIGHTS")**.

w.    Case number CV 17-4441 DSF (PLAx) *United States v. All Right and title to the Yacht M/Y Equanimity.* ("**THE EQUANIMITY**").

x.    Case number CV 17-4446 DSF (PLAx) *United States v. Certain Rights to and Interests in Shares of Series D Preferred Stock in Palantir Technologies* (**"PALANTIR STOCK"**).

y.    Case number CV 17-4440 DSF (PLAx) *United States v. One Metropolis Poster* ("**METROPOLIS POSTER**").

z.    Case number CV 17-4444 DSF (PLAx) *United States v. Real Property Located in New York, New York* ("**ONE MADISON PARK CONDOMINIUM**").

aa.    Case number CV 17-4448 DSF (PLAx) *United States v. All Rights to and Interests in the Shares of Flywheel Common Stock Held or Acquired by FW Sports Investments* LLC (**"FLYWHEEL SHARES"**).

bb.    Case number CV 17-4445 DSF (PLAx) *United States v. One 18-Carat White Gold Diamond Jewelry Set et al.* (**"11.72-CARAT HEART-SHAPED DIAMOND"**).

cc.    Case number CV 17-4445 DSF (PLAx) *United States v. One 18-Carat White Gold Diamond Jewelry Set et al.* ("**8.88-CARAT DIAMOND PENDANT**").

dd.    Case number CV 17-4445 DSF (PLAx) *United States v. One Pair of Diamond Earrings and Matching Diamond Ring* (**"MATCHING DIAMOND JEWELRY SET"**).

ee.     Case number CV 17-4449 DSF (PLAx) *United States v. One Pair of Diamond Earrings and Matching Diamond Ring* (**"MATCHING DIAMOND RING AND EARRINGS"**).

ff.     Case number CV 17-4443 DSF (PLAx) *United States v. One Painting Entitled "Nature Morte Au Crane De Taureau" by Pablo Picasso, One Collage Entitled "Redman One" by Jean-Michel Basquiat, and One Photograph Entitled "Boy With the Toy Hand Grenade" by Diane Arbus* (**"PICASSO PAINTING"**, "**BASQUIAT COLLAGE"** and **"ARBUS PHOTOGRAPH"**, respectively).

gg.     Case number CV 19-1325 DSF (PLAx) *United States v. $5,407,252.87 In Funds Constituting the Sale Proceeds of Real Property Located in New York, New York* (**"OCEANA 57"**).

hh.     Case number CV 19-1326 DSF (PLAx) *United States v. Real Property Located in London, United Kingdom titled in the name of Red Mountain Global Ltd.* (**"RED MOUNTAIN PROPERTY"**).

ii.     Case number CV 19-1327 DSF (PLAx) *United States v. Up To $28,174,145.52 in Huntington National Bank Escrow Account Number '7196; Up To $1,148,739.35 in Barclays Bank Of Delaware Account Number '6111; And Up To $162,486.88 in Fidelity Investments, Inc. Account Number '9340* (**"COMPANY 1 FUNDS"**).

jj.     Case number CV 20-5910 DSF (PLAx): *United States v. One Drawing Entitled "Self-Portrait" by Jean-Michel Basquiat* ("**BASQUIAT DRAWING"**).

kk.     Case number CV 20-5917 DSF (PLAx): *United States v. One Portrait Entitled "Round Jackie" by Andy Warhol* ("**WARHOL PORTRAIT"**).

ll.     Case number CV 20-5911 DSF (PLAx): *United States v. Real Property Located in Paris, France Titled in the Name of Ave Raphael (Paris) SCI* (**"AVE RAPHAEL APARTMENT"**).

mm. Case number CV 20-5916 DSF (PLAx): *United States v. One Painting Entitled "Colored Campbell's Soup Can (Emerald Green), 1965" by Andy Warhol and One Painting Entitled "Vétheuil au Soleil" by Claude Monet* ("**CAMPBELL'S SOUP CAN AND VÉTHEUIL AU SOLEIL PAINTINGS**").

nn. Case number CV 20-5914 DSF (PLAx): *United States v. All Funds and Assets, Including Securities and Investments, on Deposit in Falcon Private Bank Limited Account Numbers '6001 and '6001.1001* ("**RIVER DEE FUNDS**").

oo. Case number CV 20-8465 DSF (PLAx): *United States v. Forty-Nine Movie Posters in the Custody of Bonhams 1793 Limited in the United Kingdom* ("**BONHAMS MOVIE POSTERS**").

pp. Case number CV 20-8466 DSF (PLAx): *United States v. All Funds Constituting Arbitration Award in* Petrosaudi v. PDVSA *UNCITRAL Arbitration* **("PETROSAUDI ARBITRATION AWARD").**

## NATURE OF THE ACTION

6. This is a civil action *in rem* to forfeit assets involved in and traceable to an international conspiracy to, among other things, launder money misappropriated from 1Malaysia Development Berhad ("1MDB"), a strategic investment and development company wholly-owned by the government of Malaysia.[1]  The United States seeks forfeiture of property located abroad pursuant to 18 U.S.C. § 981(a)(1)(C), on the ground that it was derived from violations of U.S. law, and pursuant to 18 U.S.C. § 981(a)(1)(A), on the ground that it is traceable to property involved in one or more money laundering offenses in violation of 18 U.S.C. §§ 1956 and/or 1957.

7. 1MDB was ostensibly created to pursue investment and development projects for the economic benefit of Malaysia and its people, primarily relying on the issuance of various debt securities to fund these projects.  However, between approximately 2009 and at least 2014, multiple individuals, including public officials

---

[1] Malaysia is a sovereign country located in Southeast Asia.

and their associates and various corporations, conspired to fraudulently divert billions of dollars from 1MDB through various means, including by defrauding 1MDB's Board of Directors and financial institutions, and sending or causing to be sent foreign wire communications in furtherance of the scheme, and thereafter, to launder the proceeds of that criminal conduct, including in and through U.S. financial institutions.  The funds diverted from 1MDB were used for, among other things, the personal use and benefit of the co-conspirators and their relatives and associates, including to purchase luxury real estate in the United States and overseas, acquire stock in United States companies, pay gambling expenses at Las Vegas casinos, acquire more than $200 million in artwork, purchase lavish gifts for family members and associates, invest in a major New York real estate development project, and fund the production of major Hollywood films.  1MDB maintained no interest in these assets and saw no returns on these investments.

8.    The criminal conduct alleged in this Complaint occurred in at least four principal phases:

9.    The "Good Star" Phase:  The fraudulent diversion of funds from 1MDB began in approximately September 2009, soon after 1MDB's creation.  Between 2009 and 2011, under the pretense of investing in a joint venture between 1MDB and PetroSaudi, certain senior officials of 1MDB and senior officials of PetroSaudi and others arranged for the fraudulent transfer of more than $1 billion from 1MDB to a Swiss bank account held in the name of Good Star Limited ("Good Star Account").  Officials at 1MDB caused this diversion of funds by, among other things, providing false information to banks about the ownership of the Good Star Account.  Contrary to representations made by 1MDB officials, the Good Star Account was beneficially owned not by PetroSaudi or the joint venture, but by LOW Taek Jho, a/k/a Jho Low ("LOW"), a Malaysian national who had no formal position with 1MDB but who was involved in its creation and exercised significant control over its dealings.  LOW laundered more than $400 million in misappropriated funds from 1MDB through the Good Star Account into the United States, after which these funds were used for the personal use and benefit of

LOW and his associates.[2]  LOW and 1MDB officials tried to cover up this diversion of funds by converting 1MDB's interest in the joint venture into opaque securities and then causing those securities to be fraudulently overvalued.

10.    The "Aabar-BVI" Phase:  In 2012, 1MDB officials and others misappropriated and fraudulently diverted a substantial portion of the proceeds that 1MDB raised through two separate bond offerings arranged and underwritten by Goldman Sachs International ("Goldman").  The bonds were guaranteed by both 1MDB and the International Petroleum Investment Company ("IPIC"), an investment fund wholly-owned by the government of Abu Dhabi, in the United Arab Emirates ("U.A.E.").[3]  Beginning almost immediately after 1MDB received the proceeds of each of these two bond issues, 1MDB officials caused a substantial portion of the proceeds – approximately $1.367 billion, a sum equivalent to more than forty percent of the total net proceeds raised – to be wire transferred to a Swiss bank account belonging to a British Virgin Islands entity called Aabar Investments PJS Limited ("Aabar-BVI").

11.    Aabar-BVI was created and named to give the impression that it was associated with Aabar Investments PJS ("Aabar"), a subsidiary of IPIC incorporated in Abu Dhabi.  In reality, Aabar-BVI has no genuine affiliation with Aabar or IPIC, and the Swiss bank account belonging to Aabar-BVI ("Aabar-BVI Swiss Account") was used to siphon off proceeds of the 2012 bond sales for the personal benefit of officials at IPIC, Aabar, and 1MDB and their associates.  Funds diverted through the Aabar-BVI Swiss Account were transferred to, among other places, a Singapore bank account controlled by TAN Kim Loong, a/k/a Eric Tan ("TAN"), an associate of LOW.  Those funds were thereafter distributed for the personal benefit of various individuals, including officials at 1MDB, IPIC, or Aabar, rather than for the benefit of 1MDB, IPIC, or Aabar.

---

[2] All amounts referenced in dollars ($) are denominated in U.S. dollars and all dates, times, and monetary amounts are approximate.

[3] The United Arab Emirates is a sovereign nation in the Arabian Peninsula, comprising seven separate emirates, including the Emirate of Abu Dhabi ("Abu Dhabi").

12.   <u>The "Tanore" Phase</u>:   In 2013, several individuals, including 1MDB officials, diverted more than $1.26 billion out of a total of $3 billion in principal that 1MDB raised through a third bond offering arranged by Goldman in March 2013.   The proceeds of this bond offering were to be used by 1MDB to fund a joint venture with Aabar known as the Abu Dhabi Malaysia Investment Company ("ADMIC").   However, beginning days after the bond sale, a significant portion of the proceeds was instead diverted to a bank account in Singapore held by Tanore Finance Corporation ("Tanore Account"), for which TAN was the recorded beneficial owner.   Although the Tanore Account had no legitimate connection to 1MDB, the then-Executive Director of 1MDB, "Jasmine" LOO Ai Swan ("LOO"), was an authorized signatory on the account.   1MDB funds transferred into the Tanore Account were used for the personal benefit of LOW and his associates, including officials at 1MDB, rather than for the benefit of 1MDB or ADMIC.   As set forth below, the TROIS FEMMES NUES DRAWING is traceable to funds diverted through this phase.

13.   <u>The "Options Buyback" Phase</u>:   In 2014, an additional roughly $850 million in 1MDB funds was misappropriated under the guise of paying Aabar to relinquish certain options it had been given in consideration of IPIC's guarantee of the 2012 bonds. 1MDB borrowed a total of $1.225 billion from a syndicate of banks led by Deutsche Bank in Singapore to fund these payments to Aabar.   In fact, however, 1MDB and Aabar officials diverted more than $850 million to Aabar-BVI and another similar entity incorporated in the Seychelles ("Aabar-Seychelles") that appeared to be, but was not, affiliated with IPIC and Aabar.   From there, the funds were used, among other things, to purchase a luxury yacht for LOW's personal benefit.   A portion of the diverted loan proceeds was also used in an elaborate, Ponzi-like scheme to create the false appearance that 1MDB's earlier investment in the PetroSaudi joint venture had been profitable.   As set forth below, the GLEN VINE ACCOUNT is traceable to funds diverted through this phase.

14.   The proceeds of each of these four phases of criminal conduct were laundered through a complex series of transactions, including through bank accounts in

Singapore, Switzerland, Luxembourg, and the United States. Use of the U.S. financial system was an essential feature of both the fraudulent diversion of 1MDB funds and of the subsequent movement of ill-gotten proceeds around the world.

15. Numerous assets, including the DEFENDANT ASSETS, were acquired with funds unlawfully diverted from 1MDB, or funds traceable thereto. As a result, the DEFENDANT ASSETS are subject to forfeiture to the United States pursuant to 18 U.S.C. § 981(a)(1)(A) because they are property involved in one or more laundering transactions in violation of 18 U.S.C. §§ 1956 and/or 1957, and 18 U.S.C. § 981(a)(1)(C) because they are property constituting or derived from proceeds traceable to one or more violations of U.S. law defined as specified unlawful activity in 18 U.S.C. §§ 1957(c)(7) and/or 1961(1).

## JURISDICTION AND VENUE

16. This is a civil forfeiture action brought pursuant to 18 U.S.C. § 981(a)(1)(A) and (C).

17. This Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1345 and 1355.

18. Venue lies in this district pursuant to 28 U.S.C. §§ 1355(b)(1)(A) and 1355(b)(2) because acts and omissions giving rise to the forfeiture took place in the Central District of California.

## BACKGROUND:  RELEVANT INDIVIDUALS AND ENTITIES

19. **1Malaysia Development Berhad** ("**1MDB**") is a strategic investment and development company wholly-owned by the Malaysian government, through the Malaysian Ministry of Finance ("MOF"). It was formed in 2009 when the Malaysian government took control of a municipal entity called Terengganu Investment Authority ("TIA").[4] 1MDB's governance structure has been comprised of a senior leadership team, a Board of Directors ("1MDB Board of Directors" or "1MDB Board"), and a

---

[4] Except where a distinction is made, all references to 1MDB may refer to TIA before it was renamed 1MDB.

Board of Advisors.  Unless otherwise specified, references to 1MDB may include any of its wholly-owned subsidiaries.

20.    **International Petroleum Investment Company** ("**IPIC**") is an investment entity wholly-owned by the Abu Dhabi government.  Its management is comprised of a Chairman, Deputy Chairman, Board of Directors, and Managing Director.

21.    **Aabar Investments PJS** ("**Aabar**") is a public joint stock company incorporated under the laws of Abu Dhabi and a subsidiary of IPIC.

22.    **Aabar Investments PJS Ltd.** is the name of at least two different entities created to mimic the IPIC subsidiary Aabar Investments PJS: (a) one incorporated in the British Virgin Islands in March 2012 by QUBAISI and HUSSEINY ("Aabar-BVI"), and (b) one incorporated in the Seychelles[5] in May 2014 by HUSSEINY ("Aabar-Seychelles").  Aabar-BVI maintained a bank account at BSI Bank in Switzerland, and Aabar-Seychelles maintained a bank account at UBS AG in Singapore.  IPIC and Aabar have clarified that neither entity is their affiliate.

23.    **Abu Dhabi Malaysia Investment Company** ("**ADMIC**") is a purported 50:50 joint venture between 1MDB and Aabar that was created in or around March 2013 for the stated purpose of promoting the growth and development of Malaysia and Abu Dhabi.  It was never capitalized.

24.    **LOW Taek Jho, a/k/a/ Jho Low** ("**LOW**") is a Malaysian national who advised on the creation of TIA, 1MDB's predecessor.  LOW has never held a formal position at 1MDB, and he has publicly denied any involvement with 1MDB after its inception.  LOW nevertheless exercised significant control over 1MDB during the time period relevant to this Complaint.

25.    **1MDB OFFICER 1** is a Malaysian national who served as the Executive Director of 1MDB from the time of its creation until approximately March 2011.  During this time, 1MDB OFFICER 1 was a "public official" as that term is used in 18 U.S.C.

---

[5] Seychelles is a sovereign country located in the Indian Ocean off the coast of East Africa.

§ 1956(c)(7)(B)(iv) and a "public servant" as that term is used in Section 21 of the Malaysian Penal Code.

26.    **1MDB OFFICER 2** is a Malaysian national who served as 1MDB's Chief Executive Officer ("CEO") between at least 2009 and 2013. During this time, 1MDB OFFICER 2 was a "public official" as that term is used in 18 U.S.C. § 1956(c)(7)(B)(iv) and a "public servant" as that term is used in Section 21 of the Malaysian Penal Code.

27.    **"Jasmine" LOO Ai Swan ("LOO")** is a Malaysian national who served as 1MDB's General Counsel and Executive Director of Group Strategy during, at a minimum, 2012 and 2013. LOO was a main point of contact between 1MDB and investment bank Goldman Sachs in connection with the three Goldman-underwritten bond offerings in 2012 and 2013. During this time, LOO was a "public official" as that term is used in 18 U.S.C. § 1956(c)(7)(B)(iv) and a "public servant" as that term is used in Section 21 of the Malaysian Penal Code.

28.    **1MDB OFFICER 4** is a Malaysian national who served as the Executive Director of Finance at 1MDB from, at a minimum, 2012 to 2015. He worked on the Goldman bond deals and served as a main point of contact on two loans that Deutsche Bank arranged for 1MDB in 2014. During this time, 1MDB OFFICER 4 was a "public official" as that term is used in 18 U.S.C. § 1956(c)(7)(B)(iv) and a "public servant" as that term is used in Section 21 of the Malaysian Penal Code.

29.    **1MDB-SRC OFFICER**, a Malaysian national, was the Chief Executive Officer and Director of SRC International Sdn. Bhd. ("SRC International") from late 2011 through 2013, at a minimum. SRC International was a one-time subsidiary of 1MDB that was transferred to direct ownership by the Malaysian Ministry of Finance in 2012. In 2011, prior to assuming his role at SRC International, the 1MDB-SRC OFFICER was the Chief Investment Officer of 1MDB. During these time periods, the 1MDB-SRC OFFICER was a "public official" as that term is used in 18 U.S.C. § 1956(c)(7)(B)(iv) and a "public servant" as that term is used in Section 21 of the Malaysian Penal Code.

30.     **MALAYSIAN OFFICIAL 1** is a high-ranking official in the Malaysian government who also held a position of authority with 1MDB.  During all times relevant to the Complaint, MALAYSIAN OFFICIAL 1 was a "public official" as that term is used in 18 U.S.C. § 1956(c)(7)(B)(iv) and a "public servant" as that term is used in Section 21 of the Malaysian Penal Code.

31.     **"Eric" TAN Kim Loong** ("**TAN**") is a Malaysian national and an associate of LOW.  He also served as a proxy for LOW in numerous financial transactions.  He was the stated beneficial owner of several bank accounts into which misappropriated 1MDB funds were transferred.

32.     **Khadem Abdulla Al-QUBAISI** ("**QUBAISI**"), a U.A.E. national, was the Managing Director of IPIC from 2007 to 2015 and the Chairman of Aabar in at least 2012 and 2013.  During this time, he was a "public official" as that term is used in 18 U.S.C. § 1956(c)(7)(B)(iv) and a "public official" as that term is used in Article(5) of United Arab Emirates Law, Federal Law No (3) Of 1989 On Issuance Of The Penal Code.  QUBAISI also was a director of Aabar-BVI.

33.     **Mohamed Ahmed Badawy Al-HUSSEINY** ("**HUSSEINY**"), a U.S. citizen, was the CEO of Aabar from 2010 to 2015.  During this time, he was a "public official" as that term is used in 18 U.S.C. § 1956(c)(7)(B)(iv) and a "public official" as that term is used in Article(5) of  United Arab Emirates Law, Federal Law No (3) Of 1989 On Issuance Of The Penal Code.  He was also a director of Aabar-BVI and Aabar-Seychelles.

## EVIDENCE SUPPORTING FORFEITURE

34.     The DEFENDANT ASSETS represent a portion of the proceeds of the roughly $4.5 billion misappropriated from 1MDB.  The misappropriated funds, including the DEFENDANT ASSETS, funded the co-conspirators' lavish lifestyles, including purchases of artwork and jewelry, the acquisition of luxury real estate and luxury yachts, the payment of gambling expenses, and the hiring of musicians and celebrities to attend parties.  The use of the diverted 1MDB funds for the personal

benefit of the co-conspirators and their associates was not consistent with the purposes for which 1MDB raised the funds, and neither 1MDB nor the government of Malaysia realized any returns on these purchases and expenditures.

## I.     BACKGROUND ON THE FORMATION OF 1MDB

35.     1MDB is an investment and development entity wholly-owned by the government of Malaysia, through the Ministry of Finance ("MOF").  It grew out of an entity called "Terengganu Investment Authority" ("TIA").  To raise capital for its operations, TIA issued and sold Islamic medium-term notes ("IMTNs"), a form of debt security, valued at 5 billion Malaysian ringgit (MYR).  By 2009 conversion rates, this amounted to approximately $1,425,680,000.  The IMTNs were 30-year notes with a yield of approximately 5.75 percent, issued with the assistance of AmBank in Malaysia.

36.     LOW Taek Jho, a/k/a Jho LOW ("LOW"), a Malaysian national, served as an advisor to TIA and its founders as early as January 2009.

37.     Electronic communications between Goldman employees and individuals involved with TIA confirm that LOW was involved in the creation of TIA.  For example, on or about January 14, 2009, 1MDB OFFICER 1, who served as TIA's Executive Director of Business Development and later became the Executive Director of 1MDB, sent an email to, among others, LOW and Goldman employees with the subject line "Re: Project TIARA."  In this email, 1MDB OFFICER 1 stated, referring to LOW: "I think it is best to get Jho involve[d] at every stage.  Jho will revert on the suitability of dates n [sic] time for the next 48 hrs."

38.     On or about March 31, 2009, LOW sent an email to a Goldman employee and 1MDB OFFICER 1 with the subject line "Re – Press Answer URGENT."  In the email, LOW stated:

> Bro, here is outline of the issues I would like to discuss with the Terengganu Investment Authority. In essence the disquiet surrounding the plan is that the fund will operate entirely on borrowed money, which is largely anathema

because it puts taxpayer's money at risk. Could they elaborate on this concern?

There is also the issue of transparency and will the money go towards portfolio investments or be used to buy strategic stakes in companies.? [sic]

39.     According to Malaysian news reports and archived 1MDB press releases, in or around July 2009, the Malaysian Ministry of Finance assumed control of TIA and the more than $1 billion in IMTNs issued by TIA.  In September 2009, TIA's name was changed to 1MDB.  The Malaysian government also became a guarantor on the IMTNs.  1MDB was to act as a strategic development company, wholly owned by the Malaysian government, with a mission to promote Malaysian economic development through global partnerships and foreign direct investment.  Pursuant to its governing documents, including its Articles of Association, the Malaysian government exercised a high degree of control over 1MDB.

40.     Upon its formation, MALAYSIAN OFFICIAL 1 assumed a position of authority with 1MDB.  MALAYSIAN OFFICIAL 1 had the authority to approve all appointments to, and removals from, 1MDB's Board of Directors and 1MDB's Senior Management Team.  In addition, any financial commitments by 1MDB, including investments, that were likely to affect a guarantee given by the government of Malaysia for the benefit of 1MDB or any policy of the Malaysian government, required the approval of MALAYSIAN OFFICIAL 1.

## II.     THE GOOD STAR PHASE:  MORE THAN $1 BILLION IS MISAPPROPRIATED FROM 1MDB

41.     As one of its first investment projects, 1MDB entered into an agreement in September 2009 with PetroSaudi International Ltd. ("PetroSaudi"), a private Saudi Arabia-based oil services company incorporated in Saudi Arabia, which maintains offices in the United Kingdom, to form a joint venture through a PetroSaudi subsidiary, called 1MDB PetroSaudi Ltd. ("the 1MDB-PetroSaudi JV" or "Joint Venture").  Under

the terms of the agreement, (a) 1MDB agreed to invest $1 billion in cash in the Joint Venture in exchange for a forty percent (40%) equity interest in the Joint Venture, and (b) a PetroSaudi subsidiary agreed to give the Joint Venture energy interests it purportedly owned in Turkmenistan and Argentina in exchange for a sixty percent (60%) equity interest in the Joint Venture. To induce 1MDB's Board to approve this $1 billion investment, PetroSaudi and its co-founder and CEO, Tarek Obaid (OBAID), falsely represented and caused to be represented to the 1MDB Board, among other things, that these energy interests were owned by the PetroSaudi subsidiary and were valued at approximately $2.7 billion. OBAID was assisted in making these false representations by Patrick MAHONY, PetroSaudi's Chief Investment Officer, and both individuals received portions of the fraudulently-obtained funds in their personal accounts. Other portions of the fraudulently-obtained funds went into the accounts of business entities controlled by OBAID.

42. Both 1MDB's Board of Directors and Bank Negara, Malaysia's Central Bank, approved the transfer of $1 billion to the Joint Venture. However, on or about September 30 through October 2, 2009, LOW and his associates caused $700 million of the $1 billion that was to be invested in the Joint Venture to be sent to an account at RBS Coutts Bank in Zurich ("RBS Coutts") held in the name of Good Star Limited ("Good Star Account"). The remaining $300 million was wired into accounts under the control of OBAID.

43. Between May and October 2011, approximately $330 million in additional funds were wired at the direction of 1MDB officials to the Good Star Account, purportedly in connection with a financing agreement executed between 1MDB and the 1MDB-PetroSaudi JV. In fact, the funds were misappropriated.

44. Although 1MDB officials represented, including to Deutsche Bank in Malaysia, that Good Star was a wholly owned subsidiary of PetroSaudi, this was not true. According to banking records, Good Star was a company controlled by LOW, and LOW was also the Good Star Account's beneficial owner and sole authorized signatory.

This misrepresentation was made with the knowledge of the co-conspirators, including OBAID and PetroSaudi. At the time, LOW was a 29-year-old with no official position with 1MDB or PetroSaudi.

## III.   THE AABAR-BVI PHASE:  APPROXIMATELY $1.367 BILLION IS MISAPPROPRIATED FROM 1MDB

45.    In 2012, approximately $1.367 billion in 1MDB funds that were raised in two separate bond offerings were misappropriated and fraudulently diverted to bank accounts in Switzerland and Singapore. In issuing these bonds, 1MDB participated in the publication and disclosure of two offering circulars that contained material misrepresentations and omissions relating to:

a.    How the proceeds of these bond issuances would be used,

b.    The nature of the relationship between the issuer (*i.e.*, subsidiaries of 1MDB) and IPIC, the bond's third-party guarantor, and

c.    The existence of any related-party transactions connected to the 2012 bond issuances, including that 1MDB officials, IPIC officials, and their associates would personally benefit from the issuance of these bonds.

46.    After more than $1 billion had been misappropriated from 1MDB between 2009 and 2011 in the Good Star Phase, 1MDB needed to raise additional capital to fund its operations. As set forth in greater detail below, 1MDB engaged Goldman to arrange and underwrite two separate bond offerings in 2012. One of the stated purposes of the 2012 bond issues was to raise funds to allow 1MDB to acquire certain energy assets.

47.    IPIC guaranteed, either directly or indirectly, both 2012 bond offerings and, in exchange, a nominated subsidiary of IPIC was granted an option to purchase a minority share of the energy assets acquired by 1MDB.

48.    Almost immediately after receiving the proceeds of each of the 2012 bond issues, 1MDB wire transferred a substantial portion of the proceeds – totaling approximately $1.367 billion between the two bond sales, or more than forty percent of the net proceeds raised – to Aabar-BVI, an entity that bears a similar name to a

legitimate subsidiary of IPIC, named Aabar.  At the time of these transfers, QUBAISI was the Managing Director of IPIC and the Chairman of Aabar; and HUSSEINY was the CEO of Aabar.  QUBAISI and HUSSEINY were also directors of Aabar-BVI.

49.     QUBAISI and HUSSEINY opened the account at BSI Bank in Lugano in the name of Aabar-BVI ("Aabar-BVI Swiss Account") and used the account to facilitate the diversion of funds from 1MDB.  LOW was also integrally involved in setting up the Aabar-BVI Swiss Account and in arranging for the fraudulent transfer of $1.367 billion from 1MDB to the Aabar-BVI Swiss Account.

50.     In their audited financial statements for the year ending on March 31, 2014, 1MDB booked their substantial payments to Aabar-BVI as an asset rather than a payment, describing it as a "refundable deposit . . . held aside as collateral for the guarantee" that IPIC provided for the 2012 bonds.

51.     In contrast, LOW and 1MDB officers represented to bank officials involved in the transfer of the $1.367 billion that the funds represented *non-refundable* payments to Aabar-BVI in consideration of IPIC's guarantee of the 2012 bonds.  The fact that $1.367 billion in proceeds of the 2012 bond sales was to be paid to Aabar-BVI was not disclosed in the bond offering circulars.

52.     Following the dismissal of QUBAISI and HUSSEINY from their positions at IPIC and Aabar in 2015, IPIC and Aabar clarified that Aabar-BVI is not owned by either entity.

53.     The Aabar-BVI Swiss Account was used to siphon off proceeds of the two 2012 bond sales for the personal benefit of individuals affiliated with IPIC, Aabar, and 1MDB, as well as their associates.  Beginning within days of receiving funds from 1MDB, Aabar-BVI transferred a total of approximately $636 million to the Singapore bank account held by Blackstone Asia Real Estate Partners ("Blackstone Account").  During this same time period, Aabar-BVI transferred, through multiple overseas investment funds, an additional approximately $465 million to the Blackstone Account.

The beneficial owner of the Blackstone Account was identified in bank records as TAN, a Malaysian national and an associate of LOW.

54.     Funds transferred to the Blackstone Account by Aabar-BVI were subsequently distributed to officials of IPIC, Aabar, and 1MDB.  Between approximately May and November 2012, shortly after Blackstone's receipt of funds from the Aabar-BVI Swiss Account, Blackstone transferred $472,750,000 into a Luxembourg account beneficially owned by QUBAISI.  During roughly the same time period, Blackstone transferred $66.6 million into two different accounts beneficially owned by HUSSEINY. In October and November 2012, Blackstone transferred $30 million to an account belonging to MALAYSIAN OFFICIAL 1.  Finally in December 2012, Blackstone transferred $5 million to a Swiss account beneficially owned by LOO, who was then 1MDB's General Counsel and Executive Director of Group Strategy.

55.     Shortly after receiving proceeds of the two 2012 bond sales from 1MDB, Aabar-BVI also transferred $238 million to a Singapore bank account belonging to Red Granite Capital, an entity owned by Riza Shahriz Bin Abdul AZIZ ("AZIZ").  AZIZ is a relative of MALAYSIAN OFFICIAL 1 and a friend of LOW.  Among other things, AZIZ used these funds to purchase luxury real estate in the United States and the United Kingdom for his personal benefit, and to fund his movie production company, Red Granite Pictures.  1MDB has disclaimed any investment interest in Red Granite Pictures.

## IV.    THE TANORE PHASE:  MORE THAN $1.26 BILLION IS MISAPPROPRIATED FROM 1MDB

### A. EXECUTIVE SUMMARY OF THE TANORE PHASE

56.     As set forth in greater detail in the sections that follow, in 2013, more than $1.26 billion in 1MDB funds that were raised in a third bond offering arranged by Goldman were misappropriated and fraudulently diverted to bank accounts in Switzerland and Singapore.  In issuing these bonds, 1MDB participated in the publication and disclosure of an offering circular that again contained material

misrepresentations and omitted material facts necessary to render its representations not misleading regarding:

- How the proceeds of these bond issuances would be used, and
- The existence of any related-party transactions connected to the 2013 bond issuances, including that 1MDB officials and their associates and relatives would personally benefit from the issuance of these bonds.

57.    1MDB issued an additional $3 billion in Goldman-underwritten bonds in March 2013.  Notwithstanding the fact that the stated purpose of these bonds was to generate proceeds to invest in the ADMIC joint venture with Aabar, more than $1.26 billion in proceeds was diverted to a bank account held in the name of Tanore Finance Corporation ("Tanore Account").  As with the Blackstone Account, TAN was the beneficial owner of record for the Tanore Account.  Although the account had no legitimate affiliation with 1MDB or ADMIC, LOO was an authorized signatory on the Tanore Account.

58.    Funds transferred to the Tanore Account were distributed for the benefit of at least one public official associated with 1MDB.  More particularly, very shortly after the bond offering closed, between approximately March 21, 2013, and March 25, 2013, $681 million was transferred from the Tanore Account to an account belonging to MALAYSIAN OFFICIAL 1.  Of this amount, approximately $620 million was returned to the Tanore Account on or about August 26, 2013.

59.    1MDB funds diverted to the Tanore Account were also used by LOW and TAN to purchase artwork for their personal benefit and to purchase an interest in the Park Lane Hotel in New York City for the personal benefit of LOW.  The disposition of these funds was not consistent with the intended use of the 2013 bond proceeds nor was it made for the benefit of 1MDB or ADMIC.

60.    As set forth in Section VI.A below, one of the DEFENDANT ASSETS, the TROIS FEMMES NUES DRAWING, is traceable to funds diverted through this phase of the criminal scheme.

## B. IN MARCH 2013, 1MDB ISSUED $3 BILLION IN GOLDMAN-UNDERWRITTEN BONDS FOR INVESTMENT IN A JOINT VENTURE WITH AABAR

61.     According to the ADMIC joint venture agreement ("ADMIC Agreement"), the formation of ADMIC was "of strategic importance to the government-to-government relationship between the Government of the Emirate of Abu Dhabi and the Government of Malaysia, given the strategic initiatives to be undertaken jointly by the Parties and the catalytic effect such initiatives are expected to have upon the growth and development of Malaysia and the Emirate of Abu Dhabi respectively."[6]

62.     Pursuant to the ADMIC Agreement, ADMIC was to be capitalized by an investment of $3 billion by 1MDB and $3 billion by Aabar.  1MDB and Aabar, as the two shareholders of the company, were to adopt an investment plan for ADMIC, to include a "five (5) year strategic roadmap for the investment policies of the Company," as soon as practicable after formation of the company.

63.     The ADMIC Agreement provides that "the Company [i.e., ADMIC] will open and maintain bank accounts in the name of [ADMIC]."  It further provides that "[a]ll monies of [ADMIC], and all instruments for the payment of money to [ADMIC], shall be deposited in the bank accounts of [ADMIC]."

64.     The joint venture agreement was signed by QUBAISI, as the Chairman of Aabar, and by the Chairman of 1MDB's Board of Directors; and it was witnessed by HUSSEINY, the CEO of Aabar, and by 1MDB OFFICER 2, the CEO of 1MDB.  Aabar appointed QUBAISI as a director of ADMIC and 1MDB appointed its Chief Financial Officer.

---

[6] ADMIC is an entity distinct from the Abu Dhabi Malaysia Kuwait Investment Corporation ("ADKMIC").  The former was a purported joint venture between 1MDB and Aabar in which the proceeds of the Project Catalyze bond were supposed to be invested, whereas the latter was an entity owned and controlled by LOW that was used to launder funds.

65.    At least as early as mid-January 2013, officials at 1MDB enlisted Goldman's assistance to finance its capital contribution to the planned joint venture through privately placed debt securities.  LOO served as a main point of contact between 1MDB and Goldman on this deal.  Within Goldman, this bond transaction was referred to by the name "Project Catalyze."

66.    In a March 2013 presentation prepared for 1MDB, IPIC, and Aabar in connection with the deal, Goldman set forth its understanding of 1MDB's "key objectives."  Foremost among these were "maintenance of confidentiality during execution" of the deal and "speed of execution."

67.    1MDB issued approximately $3 billion in bonds through its third private placement with Goldman.  The closing date for the bond issue was March 19, 2013.  The notes had a 4.4% interest rate and were redeemable in 2023.  The offering circular, dated March 16, 2013, listed the net proceeds of the bond sale, once Goldman's fees, commissions, and expenses were deducted, as approximately $2,716,760,000.  The bonds were issued by 1MDB Global Investments Limited ("1MDB Global"), a wholly owned subsidiary of 1MDB that was incorporated in the British Virgin Islands on March 8, 2013.

68.    The Government of Malaysia provided a "Letter of Support," dated March 14, 2013, in connection with the Project Catalyze transaction.  That Letter of Support provided, among other things, that if 1MDB failed to provide adequate capital to ensure that 1MDB Global was able to service its obligations with respect to the bonds, Malaysia would then "step-in to inject the necessary capital into the Issuer or make payments to ensure the Issuer's obligation in respect of the Debt are fully met."  The Letter of Support also indicated that, "[t]o the fullest extent permitted by law," Malaysia would waive its sovereign immunity and submit itself to the jurisdiction of English courts in connection with disputes arising out of the letter.  The letter is signed by MALAYSIAN OFFICIAL 1.

69.     The offering circular represents that 1MDB Global intended to "either on-lend all of the net proceeds of this Offering to ADMIC or use the net proceeds of the offering to fund its investment in ADMIC, which will be a 50:50 joint venture between the Issuer and Aabar."  The offering circular noted that "ADMIC has yet to adopt a formal investment plan or establish investment criteria."  It further represented that "ADMIC does not have any specific investment, merger, stock exchange, asset acquisition, reorganization, or other business combination under consideration or contemplation and ADMIC has not, nor has anyone on ADMIC's behalf, contacted, or been contacted by, any potential target investment or had any discussions, formal or otherwise, with respect to such a transaction."  The circular goes on to note that, "ADMIC does not currently have an investment plan or investment criteria in place.  The Board of Directors intends to adopt an investment plan as soon as is practicable.  The investment plan, and any future investments, will be made with the mutual agreement of the shareholders of ADMIC," *i.e.*, Aabar and 1MDB.

70.     In a press release issued on April 23, 2013, 1MDB indicated that, "[t]he proceeds from the US$3 billion capital raised will be utilised for investments in strategic and important high-impact projects like energy and strategic real estate which are vital to the long term-economic [sic] growth of both countries."  The press release gave, as an example of a future investment project, the Tun Razak Exchange (TRX).  The Tun Razak Exchange is a project to develop a financial center in downtown Kuala Lumpur that has yet to be completed.

71.     In truth, however, instead of being used to fund ADMIC, more than $1.26 billion in bond proceeds from the 2013 bond offering were diverted to unrelated overseas shell company accounts, including the Tanore Account at Falcon Bank in Singapore and an account opened in the name of Granton Property Holdings Limited at Falcon Bank ("Granton Account").

72.     The offering circular also omitted material facts necessary to makes it representations regarding the use of the bond proceeds not misleading, in that it failed to

disclose that certain individuals related to 1MDB, including MALAYSIAN OFFICIAL 1, would receive hundreds of millions of dollars from the proceeds of the bond sale within days of its closing. This fact would have been material to the bond transaction, as it would have alerted investors to the possibility of conflicts of interest and related-party transactions. The representation that ADMIC had not determined how all of the bond proceeds would be used did not encompass using those funds, beginning almost immediately after the bond issue, for the personal benefit of individuals related to 1MDB and their associates.

## C.  FUNDS FROM THE 2013 BOND SALE WERE DIVERTED TO THE TANORE ACCOUNT

73.  Notwithstanding the fact that 1MDB represented in the offering circular and its press release that the proceeds of the 2013 bond sale would be used to fund ADMIC, more than $1.26 billion was diverted from the proceeds of the 2013 bond sale through bank accounts controlled by TAN and held in the name of various entities, including Tanore Finance Corporation and Granton Property Holdings. This approximately $1.26 billion in funds was neither lent to ADMIC nor used to fund 1MDB's investment in ADMIC, as represented in the bond offering circular, but instead was held and used for the benefit of LOW and his associates, including public officials of 1MDB.

### 1.  *The Movement of Funds Through the Overseas Investment Funds*

74.  On or about March 19, 2013, a total of $2.721 billion, representing proceeds of the Project Catalyze bond sale, was transferred from Bank of New York Mellon into the BSI Lugano account of 1MDB Global in two separate wires of $2,494,250,000 and $226,750,000. The payments details listed in both SWIFT messages indicate, in relevant part: "ATTN [SINGAPORE BANKER 1.]" SINGAPORE BANKER 1 is the same individual whose name appears in Good Star's corporate records. At the time of the wire transfers to 1MDB Global, SINGAPORE BANKER 1 was employed by BSI Bank in Singapore.

75.     Between May 21 and 27, 2013, 1MDB Global transferred a total of $1.590 billion from its account at BSI Lugano to accounts belonging to three different overseas investment funds:  Devonshire Capital Growth Fund ("Devonshire"), a fund located in the British Virgin Islands; Enterprise, a fund located in Curacao; and Cistenique, another fund located in Curacao (collectively, the "Overseas Investment Funds" or "Funds"). This money was routed via the clearing company Citco, before being transferred into the accounts of the Overseas Investment Funds.  Two of these three funds, Cistenique and Enterprise, were used in 2012 to pass funds traceable to the Project Maximus bond proceeds from Aabar-BVI to Blackstone.

76.     The approximate dates and aggregated amounts of these transfers from 1MDB Global to the three Overseas Investments Funds, via Citco, are set forth below:

**Table 1:  Wire Transfers from 1MDB Global to Overseas Investment Funds**

| Dates | Sending Party | Receiving Party | Amount |
|---|---|---|---|
| 3/21/2013 | 1MDB Global | Devonshire | $646,464,649 |
| 3/21/13 - 3/27/2013 | 1MDB Global | Enterprise | $414,756,416 |
| 3/21/13 - 3/22/2013 | 1MDB Global | Cistenique | $531,090,534 |

77.     Within approximately two days after 1MDB Global began its transfer of more than $1.5 billion to the Overseas Investment Funds, the Overseas Investment Funds collectively transferred a total of $835 million to the Tanore Account.  The approximate dates and amounts of these wires, which passed through a correspondent bank account at J.P. Morgan Chase in the United States, are summarized below:

**Table 2: Wire Transfers from Overseas Investment Funds to Tanore**

| Date | Sending Party | Sending Party Bank | Receiving Party | Amount |
|---|---|---|---|---|
| 3/21/2013 | Devonshire | BSI Bank - Singapore | Tanore | $210,000,000 |

26

| 3/22/2013 | Enterprise | ING Bank - Netherlands | Tanore | $250,000,000 |
| 3/22/2013 | Cistenique | ING Bank Netherlands | Tanore | $375,000,000 |

78.     TAN opened the Tanore Account on or about November 2, 2012, and he was originally its sole authorized signatory.  Bank records list HUSSEINY, who was Chairman of Falcon Bank, as the "referrer" for the account.  TAN functioned as a proxy for LOW with respect to the Tanore Account, and LOW routinely communicated with bankers about the Tanore Account using TAN's email account.

79.     On or about March 20, 2013, one day before funds were first credited to the Tanore Account from the Overseas Investment Funds, LOO was given signing authority on the Tanore Account through the execution of a Power of Attorney form signed by LOO.  A copy of the Malaysian passport belonging to LOO was included in that documentation.  LOW was responsible for adding LOO as an authorized signatory to the account.

80.     Bank statements show that the above-referenced wire transfers from the Overseas Investment Funds, beginning on or about March 21, 2013, were the first credits to the Tanore Account.

81.     On or about March 21, 2013, Devonshire transferred an additional $430 million in 1MDB funds to the Granton Account.  Account opening documents for the Granton Account were signed by TAN.  The $430 million wire from Devonshire was processed through a U.S. correspondent bank account at J.P. Morgan Chase, and bank statements show that it was the first credit to the Granton Account.

82.     On or about that same day, March 21, 2013, Granton transferred $430 million – the same amount received from Devonshire – to the Tanore Account.  As set forth above, the Tanore Account and the Granton Account have the same beneficial owner of record (TAN).

27

83.     Approximately four days later, on or about March 25, 2013, Tanore transferred $378 million back to the Granton Account.

84.     The passage of funds back and forth through accounts held in the name of different legal entities but having the same stated beneficial owner had no legitimate commercial purpose but was instead undertaken as a means of layering these transactions to obscure the nature, source, location, ownership and/or control of the funds.

85.     The transfer of 1MDB funds through the Overseas Investment Funds to the Tanore and Granton Accounts could not have been accomplished without the participation or acquiescence of one or more officials at 1MDB.

86.     Though they had no official position with 1MDB, LOW and TAN were also involved in arranging the transfer of funds from 1MDB to Tanore, using the Overseas Investment Funds as pass-through accounts.  HUSSEINY was also involved in the financial transactions into and out of the Tanore Account, in his capacity as Falcon Bank's Chairman.  Among other things, he worked to convince compliance officials at the bank that the transactions were legitimate.

        2.     *The Diversion of Bond Proceeds Was Planned in Advance of the Bond Offering*

87.     The plan to divert bond proceeds to the Tanore Account via the Overseas Investment Funds pre-dated the March 19, 2013, bond offering.  For example, SINGAPORE BANKER 1, who served as the relationship manager for the 1MDB Global Account, emailed other bankers at BSI Bank in Singapore on or about February 24, 2013, with the subject "Aabar-1mdb update."  The email indicates that the 1MDB-Aabar joint venture was to be capitalized with $6 billion and that, of this, "USD2 billion is expected to be invested in 4 structured funds."  These funds included Enterprise, Cistenique, and Devonshire (i.e., the Overseas Investment Funds).

88.     In a subsequent email dated March 11, 2013, with the subject "Abu Dhabi Malaysia govt joint venture update," SINGAPORE BANKER 1 indicated that the "Abu

Dhabi side is taking a little longer than anticipated" to arrange for its share of the funding for the ADMIC joint venture. SINGAPORE BANKER 1 further indicated that "[w]hile awaiting for the Abu Dhabi side to get organised, 1MDB is expected to invest usd 1 billion into structured funds."

89.     Prior to the bond issuance, 1MDB officials and LOW had not only arranged to "invest" bond proceeds in the Overseas Investment Funds, contrary to the uses of proceeds identified in the offering circular; they had also chosen Tanore and Granton as the ultimate recipients of the money. BSI Bank specifically marketed the Overseas Investment Funds to LOW and 1MDB as pass-through entities, designed to allow the client (*e.g.*, 1MDB) to funnel money to a third-party of the client's choosing (*e.g.*, Tanore). Documentation was drawn up in advance by bankers at BSI to effectuate the two-step movement of funds.

90.     Bank records associated with Devonshire's account at BSI Bank in Switzerland confirm that 1MDB's "investment" in Devonshire was intended, from the outset, as a means to transmit money to Tanore. Account opening records indicate that Devonshire opened an account at BSI Lugano on or about March 18, 2013 for the specific purpose of collecting funds beneficially owned by 1MDB and transmitting those funds to a third-party holding company identified by 1MDB officials. According to an internal bank memorandum describing the anticipated pass-through transactions, the "target investment holding [company] . . . will be controlled and owned by [1MDB Global's] trusted investment nominee – Mr Tan Kim Loong." The bank understood that the transactions were structured in this layered fashion to allow 1MDB Global "to dissociate it[self] from the assets by using fiduciary fund structures."

> 3.     *The Funds Transferred to Tanore Were Not Used for the Benefit of 1MDB or ADMIC*

91.     Bank statements for the Tanore Account demonstrate that funds transferred to the Tanore Account were not thereafter transferred to an account belonging to

ADMIC or used for investment purposes with any apparent legitimate business connection to ADMIC or 1MDB.

92.   Instead, funds from the Tanore Account were sent to an account belonging to MALAYSIAN OFFICIAL 1, and were also used by TAN and LOW to purchase art. Funds from the Tanore Account were also used by LOW to acquire a substantial interest in a luxury hotel in New York City.   These uses were inconsistent with the intended purpose of the bond proceeds as set forth in the offering circular and the April 23, 2013, 1MDB press release.

93.   TAN and LOW provided Falcon Bank with a number of fraudulent documents, including loan and investment agreements, intended to justify the sizeable transfers of funds into and out of the Tanore and Granton Accounts in the days and weeks following the 2013 bond sale.   The documentation was sufficiently suspicious to trigger concern among Falcon Bank officials.

94.   On or about March 25, 2013, the Bank Manager of Falcon Bank in Singapore ("Falcon Bank Manager") called the CEO of Falcon Bank ("Falcon Bank CEO") to discuss the recent transactions into and out of the Tanore and Granton Accounts.   According to a recorded conversation, the Falcon Bank CEO conferenced in HUSSEINY to the conversation and then proceeded to say, in relevant part:

> Mohammed, the rest of the documentation, which our friend in Malaysia has delivered is absolutely ridiculous, between you and me. . . .This is . . . gonna get everybody in trouble.   This is done not professionally, unprepared, amateurish at best. The documentation they're sending me is a joke, between you and me, Mohammed, it's a joke!   This is something, how can you send hundreds of millions of dollars with documentation, you know, nine million here, twenty million there, no signatures on the bill, it's kind of cut and paste. . . . I mean it's ridiculous! . . . You're now talking to Jho [LOW], and tell him, look, you either, within the next, you know, six hours produce documentation, which my compliance people can live with, or we have a huge problem.

95.     Soon thereafter, in another recorded conversation, the Falcon Bank CEO called LOW and told him, in relevant part, as follows:

> The documentation which we have received, Jho, it's a joke. It is not good and it, it, if you look at all that stuff. . . . I looked at it, I mean with, with, with the best of, of whatever we want to see and with all that Eric and we can do, but let, you know, my compliance guys and even my general counsel, he said, look, I mean, if an outside person looks at that and . . . we have in particularly hired an outside consultant law firm to look at it from the perspective, if, if anybody just looks at it remotely, this is going to be all over the place. Receiving banks, wiring, and, and, what I try to do here is protect Eric and anybody in the room because if, if any other bank just make "peep!" and this gets reported, . . . we are gonna have a huge problem. . . .

96.     Falcon Bank nevertheless processed the transfers into and out of the Tanore Account, apparently in part because HUSSEINY vouched for the legitimacy of the transactions.

97.     TAN closed the Tanore and Granton accounts in mid-December 2013.

98.     ADMIC, which was the stated basis for the 2013 bond sale, was ultimately never funded.

## V.     THE OPTIONS BUYBACK PHASE:  APPROXIMATELY $850 MILLION IS MISAPPROPRIATED FROM 1MDB

### A.   EXECUTIVE SUMMARY OF THE OPTIONS BUYBACK PHASE

99.     As described in further detail below, in 2014, 1MDB secured two loans from Deutsche Bank, totaling $1.225 billion.  The ostensible purpose of both loans was to allow 1MDB to buy back the options that it had given to Aabar in consideration for IPIC's guarantee of the 2012 bonds, so that 1MDB could make an initial public offering of the Tanjong and Genting energy assets 1MDB acquired in connection with the two 2012 bond issuances, as discussed above.  1MDB officials secured approval of these two loans through material misrepresentations and omissions to Deutsche Bank, including

that the proceeds of the loans would be paid to a legitimate affiliate of IPIC.  In fact, the bulk of the proceeds of both loans went to Aabar-BVI and Aabar-Seychelles, two offshore entities named to create the false impression of an affiliation with IPIC.

100.   The first Deutsche Bank loan was approved in May 2014, in the amount of $250 million.  Almost immediately upon draw-down, 1MDB sent $175 million in loan proceeds to the Aabar-BVI Swiss Account.  As previously noted, the Aabar-BVI Account, which was set up by QUBAISI, HUSSEINY, and LOW, was used to siphon off funds from 1MDB and/or IPIC.  From there, the majority of the funds were passed through a series of accounts connected to TAN and LOW and ultimately ended up in the personal bank account of LOW.  Loan proceeds were also transferred indirectly to LOO and MALAYSIAN OFFICIAL 1.  A portion of these proceeds were ultimately used to establish and fund the GLEN VINE ACCOUNT, as set forth in Section VI.B below.

101.   Deutsche Bank arranged a second syndicated loan for 1MDB in September 2014 in the amount of $975 million.  This loan was collateralized by the assets held in the Brazen Sky Account.  To obtain approval of this loan, 1MDB officials made material misrepresentations about the value of the assets held by Brazen Sky, which were not liquid and were not worth anywhere near the $2.3 billion 1MDB claimed.

102.   Upon draw-down on this second loan, 1MDB requested that Deutsche Bank send close to $700 million in loan proceeds to a bank account at UBS AG in Singapore that was held in the name of Aabar Investments PJS Limited.  At the time it released the loan proceeds, compliance and risk officers at Deutsche Bank believed that the destination account was beneficially owned by a legitimate affiliate of IPIC and that the proceeds would be used to extinguish the Aabar options.  In fact, the loan proceeds were sent to the UBS bank account belonging to Aabar-Seychelles ("Aabar-Seychelles Account").  The Aabar-Seychelles Account, like the Aabar-BVI Account, was a pass-through account used to facilitate fraudulent funds transfers.

103.   The loan proceeds sent to Aabar-Seychelles were used by the co-conspirators in an elaborate series of structured transactions designed to create the

appearance that Brazen Sky was "redeeming" its investments in the Bridge Global Fund for cash. During the fall of 2014, each of the seven incoming cash transfers that Brazen Sky received from Bridge Global was actually money that 1MDB had earlier borrowed from Deutsche Bank. From the outset, this furtive use of the Deutsche Bank loan proceeds falsely created the appearance that Brazen Sky maintained valuable investments in Bridge Global fund units, and thereby concealed the giant investment losses sustained by 1MDB because of the diversion of more than $1 billion to the Good Star Account.

104.   As set forth in Section VI.B below, one of the DEFENDANT ASSETS, the GLEN VINE ACCOUNT, is traceable to funds diverted through this phase of the criminal scheme.

## B. IN 2014, 1MDB BORROWED $250 MILLION FROM DEUTSCHE BANK FOR THE OSTENSIBLE PURPOSE OF BUYING BACK THE AABAR OPTIONS

105.   In 2014, 1MDB began planning for an initial public offering ("IPO") of the power assets owned by its subsidiary 1MDB Energy Holdings Limited ("1MEHL") on a Malaysian stock exchange. 1MEHL was the holding company for 1MDB Energy and 1MDB Energy Langat, the entities that had acquired the Tanjong and Genting power assets, respectively, through issuance of the 2012 bond notes. 1MDB retained Deutsche Bank-Singapore and Maybank to coordinate the IPO process. Goldman was also asked to serve in an advisory capacity. Within Deutsche Bank, the proposed IPO transaction was known as "Project Virtus."

106.   In exchange for IPIC's guarantee of the 2012 bond notes as described above in Section III, 1MDB Energy granted Aabar-BVI a call option to acquire a 49% stake in the Tanjong assets, and 1MDB Energy Langat granted Aabar a call option to acquire a 49% stake in the Genting assets (collectively, the "Aabar options"). Because those options could be exercised at a fixed strike price at any time over a ten-year period, their value fluctuated according to the underlying value of the two power companies. IPIC

valued the Aabar options, collectively, at approximately $528 million in its 2013 consolidated financial statements.

107.   In 2014, 1MDB decided to pay Aabar to terminate the May 18, 2012 and October 17, 2012 Option Agreements ("Option Agreements"), in effect "buying back" the Aabar options.  The primary stated reason for this buyback was to allow 1MDB to retain the full benefit of any appreciation in value of the power companies as a result of the IPO (*i.e.*, to avoid having to share that upside with Aabar).

108.   In its audited financial statements for fiscal year 2014, 1MDB disclosed that it had entered into a "Settlement Agreement" with Aabar dated May 22, 2014, by which it agreed to buy back the Aabar options.  According to a copy of that agreement circulated to Deutsche Bank by 1MDB's counsel the following year, the parties to that Settlement Agreement were 1MEHL and "Aabar Investments PJS Limited," an entity located in the U.A.E.  The parties did not fix the price for the buyback in the Settlement Agreement but instead provided that 1MDB would pay a "price . . . to be mutually agreed between the parties" at a later date.  The agreement was signed by HUSSEINY and the then-CEO of 1MDB.

109.   1MDB approached Deutsche Bank in Singapore to secure financing to buy back the Aabar options in approximately Spring of 2014.  In connection with the loan approval process, Deutsche Bank received copies of the offering circulars for Project Magnolia and Project Maximus.  As discussed in Section III above, those offering circulars contained material misrepresentations and omissions related to, among other things, the use of proceeds of the 2012 bonds and the consideration given by 1MDB in exchange for IPIC's guaranteeing of the bonds.  1MDB officials did not make compliance and risk officers at Deutsche Bank aware that 1MEHL had given Aabar-BVI close to $1.4 billion in proceeds from the 2012 bonds, purportedly pursuant to an alternate version of the Option Agreements that also included a provision for the payment of a cash contribution to Aabar-BVI.

110.   On or about May 26, 2014, Deutsche Bank AG, Singapore Branch extended a $250 million bridge loan facility to 1MDB Energy Holdings Limited ("$250 million loan"). The facility agreement provided that 1MEHL, 1MDB's wholly-owned subsidiary, "shall apply all amounts borrowed by it under the Facility in or towards the corporate purposes of the Group as provided in the Borrower's board of directors' resolutions date 23 May 2014. . . ."

111.   A resolution passed by 1MEHL's directors on May 23, 2014, authorized 1MEHL to borrow up to $300 million from Deutsche Bank for the purpose of "financ[ing] the acquisition of Aabar Options and/or Other Minority Interests, interest reserve and working capital." The Resolution was signed by the Director of 1MEHL.

112.   The $250 million loan was guaranteed by 1MEHL's parent, 1MDB. This guarantee required the approval of Bank Negara, Malaysia's Central Bank, which 1MDB had not secured by the time the loan was finalized.   1MDB was required to secure this approval as a condition subsequent to the loan. Ultimately, 1MDB never obtained Bank Negara approval, for reasons that were not disclosed to Deutsche Bank, and thus it never satisfied this condition of the loan.

113.   At the time that Deutsche Bank approved the loan facility, compliance and credit risk officials understood that the loan proceeds would be used to compensate a legitimate affiliate of IPIC for the termination of the Aabar options.   This understanding was based on material misrepresentations and omissions made by 1MDB OFFICER 4, who served as 1MDB's Executive Director of Finance, and others about the intended destination of the loan proceeds and the relationship between Aabar-BVI and IPIC.

**C. A MAJORITY OF THE PROCEEDS OF THE $250 MILLION DEUTSCHE BANK LOAN WERE DIVERTED TO AND THROUGH THE AABAR-BVI ACCOUNT TO LOW, MALAYSIAN OFFICIAL #1 AND LOO, AMONG OTHERS**

114.   As described below, the bulk of the proceeds of the $250 million Deutsche Bank loan were almost immediately diverted to the Aabar-BVI Account.   Thereafter, the

35

loan proceeds were used for the personal benefit of LOW, MALAYSIAN OFFICIAL 1, and LOO, among others.

115.   On or about May 28, 2014, $239,940,000 in proceeds from the Deutsche Bank loan were transferred into the bank account of 1MEHL at Falcon Bank in Zurich ("1MEHL Account").

116.   On or about the same day, 1MEHL transferred $175 million in loan proceeds to the Aabar-BVI Swiss Account.  Aabar-BVI is not a legitimate affiliate of Aabar or IPIC, and the funds held in the Aabar-BVI Swiss Account were not held for the benefit of Aabar or IPIC.  HUSSEINY and QUBAISI falsely represented to BSI Bank that Aabar was the beneficial owner of the funds in the account, in order to facilitate the diversion of funds from 1MDB and/or IPIC.

117.   In this instance as in previous instances, the Aabar-BVI Swiss Account functioned as a pass-through account, receiving diverted funds from 1MDB and funneling them on to the co-conspirators and their associates.  Following its use in 2012 to siphon off the proceeds of the 2012 bonds, the Aabar-BVI Swiss Account saw no significant financial activity until the incoming $175 million wire from 1MEHL (with the exception of one pass-through transaction in September 2013 to an entity affiliated with TAN and LOW).  Before the $175 million wire was credited, the balance in the Aabar-BVI Swiss Account was less than $125,000.

118.   Because of the size of the transfer from 1MEHL to Aabar-BVI, BSI Bank required an explanation in order to process the incoming wire.  QUBAISI and/or HUSSEINY represented to BSI Bank that the $175 million wire transfer represented partial payment by 1MEHL to buy back the Aabar options.  BSI was provided with a copy of an "Agreement Related to Option Agreements," dated April 28, 2014, which purported to set forth the terms of the options buyback arrangement.  That agreement (hereinafter, the "BSI Buyback Agreement") provided that "Aabar Investments PJS Limited," a U.A.E. company, would assign its rights to the Aabar options to 1MEHL in exchange for $989 million, of which $175 million was payable within 30 days of the

date of the agreement.  The agreement bore the signature of QUBAISI and the then-CEO of 1MDB.

119.   The terms of the BSI Buyback Agreement were materially inconsistent with the terms of the May 22, 2014 Settlement Agreement referenced in 1MDB's audited financial statements.  As explained above in Paragraph 108, that Settlement Agreement – dated *after* the date of the BSI Buyback Agreement – provided that the cash consideration to be given to Aabar for termination of the options had not yet been determined.

120.   As set forth below, the loan proceeds transferred to the Aabar-BVI Swiss Account were used for the benefit of LOW, LOO, and MALAYSIAN OFFICIAL 1, rather than for the benefit of 1MDB, IPIC, or Aabar.  These uses were inconsistent with the purpose of the loan, which 1MDB was obligated to repay.

### 1.   Loan Proceeds Are Transferred to LOW

121.   On or about May 30, 2014, Aabar-BVI transferred $155 million of the $175 million it received from 1MEHL to an account at DBS Bank Ltd. in Singapore held in the name of Affinity Equity International Partners Limited ("Affinity Equity Account"). Affinity Equity International Partners Limited ("Affinity Equity") was a shell company, and it had no affiliation with the similarly-named Affinity Equity Partners, a major private equity firm in Asia.  Records related to the Aabar-BVI Account suggest, however, that BSI bank officials may have believed that there was a genuine affiliation between the two entities at the time they approved the $155 million transfer.  TAN was the recorded beneficial owner of the Affinity Equity Account.

122.   HUSSEINY represented to BSI Bank that Aabar-BVI's transfer of $155 million to Affinity Equity was made pursuant to a Sharia-compliant investment and profit-sharing agreement, known as a Mudharabah agreement, between Aabar-BVI and Affinity Equity.  As part of the compliance process, the bank was provided with a copy of the supposed agreement, which was dated May 26, 2014 and which bore the signatures of HUSSEINY and TAN.  Bank statements for the Affinity Equity Account

do not show financial activity consistent with the investment agreement provided to the bank. Indeed, Affinity Equity appears to be a shell corporation created for the purpose of maintaining a bank account and facilitating the transfer of funds among the co-conspirators and their associates.

123. On or about June 2, 2014, Affinity Equity transferred $142 million of the $155 million it received from Aabar-BVI to a bank account at BSI Bank in Singapore held in the name of Alpha Synergy Limited ("Alpha Synergy Account"). According to bank records, LOW was the beneficial owner of the Alpha Synergy Account. LOW was particularly secretive about the account – for example, admonishing bankers that they should "not state [the] full name" of the account but only use its initials, "ASL," in their email communications with him.

124. On or about one day later, LOW transferred this $142 million from his Alpha Synergy Account to his personal account at BSI through an intra-bank transfer. The passage of funds through the Affinity Equity and Alpha Synergy Accounts was done to conceal the source of funds and give the false impression that the money entering LOW's personal account originated from a company he controlled rather than from Aabar-BVI or 1MEHL.

**Table 3: Layered Transfer of Funds from 1MEHL to LOW**

| Date | Sending Party | Receiving Party | Amount |
|------|---------------|-----------------|--------|
| 5/28/14 | 1MEHL | Aabar-BVI | $175,000,000 |
| 5/30/14 | Aabar-BVI | Affinity Equity | $155,000,000 |
| 6/2/14 | Affinity Equity | Alpha Synergy | $142,000,000 |
| 6/3/14 | Alpha Synergy | LOW's personal account | $142,000,000 |

125. LOW used almost the full amount of funds he received from the Deutsche Bank loan proceeds to purchase a 300-foot luxury yacht. The purchase of this luxury yacht was for LOW's own personal benefit rather than for the benefit of 1MDB, and it had no legitimate connection to the business of 1MDB, IPIC, or Aabar, or to the purpose

of the $250 million loan.  LOW arranged to purchase the yacht well before 1MEHL entered into a loan agreement with Deutsche Bank.

    2. *Loan Proceeds Are Transferred to MALAYSIAN OFFICIAL 1 and LOO*

126. Proceeds of the $250 million loan also ended up in the bank accounts of MALAYSIAN OFFICIAL 1 and LOO.

127. On or about June 17, 2014, Aabar-BVI sent an additional $19 million to the Affinity Equity Account.  These funds were directly traceable to the proceeds of the loan.  Travel records show that approximately one week earlier, LOW and Low Taek Szen ("Szen") flew to Abu Dhabi on June 7, 2014.  On June 8, 2014, LOW flew to London on his jet from Abu Dhabi.  Other passengers on the flight to London included HUSSEINY and Szen.

128. On or about the following day, June 18, 2014, Affinity Equity sent $1.89 million to a bank account held in the name of Blackrock Commodities (Global) Limited ("Blackrock Account").  Despite the similarity in names, Blackrock Commodities (Global) Limited ("Blackrock") had no affiliation with the global investment management company BlackRock, Inc.  TAN was the stated beneficial owner of the Blackrock Account, although LOW also exercised de facto control over the use of funds in the account.

129. That same day, Blackrock transferred $1,277,250 to an account at AmBank in Malaysia held in the name of AMPRIVATE BANKING-MY.  Upon information and belief, MALAYSIAN OFFICIAL 1 is the beneficial owner of this account.

130. On or about July 1, 2014, Affinity Equity also sent $999,975 directly to an account controlled by LOO at Falcon Bank in Switzerland, held in the name of River Dee International SA (the "River Dee Account").  The wire was processed through a correspondent account at JP Morgan in New York.  LOO represented to Falcon Bank that this incoming remittance was in connection with a joint venture that River Dee had just entered into with Affinity Equity for "joint investments."

VI.   **THE DEFENDANT ASSETS WERE INVOLVED IN AND/OR TRACEABLE TO THE PROCEEDS OF THE FOREGOING CRIMINAL CONDUCT**

131.   As set forth below, the DEFENDANT ASSETS represent property derived from proceeds of the foregoing criminal conduct, as well as property involved in money laundering in violation of 18 U.S.C. §§ 1956 and 1957 or property traceable to such violations.

A.   **LOO PURCHASED THE TROIS FEMMES NUES DRAWING USING DIVERTED FUNDS FROM THE 2013 BOND PROCEEDS**

132.   In or about June 2014, LOO used funds traceable to the misappropriated proceeds of the 2013 "Project Catalyze" bond sale (as discussed above in Section IV) to acquire the TROIS FEMMES NUES DRAWING.

133.   As discussed above in Paragraphs 65 to 67 and 74, on or about March 19, 2013, a total of approximately $2.721 billion, representing the proceeds of the Project Catalyze bond sale, was transferred from Bank of New York Mellon into the BSI-Lugano account of 1MDB Global.

134.   On or about April 9, 2013, approximately $50.5 million was transferred from the 1MDB Global account at BSI-Lugano into an account held by Pacific Harbor Global Growth Fund Ltd. (the "Pacific Harbor Account"). Like Cistenique and Enterprise described above in Section IV.C.1, Pacific Harbor was an overseas investment fund marketed by BSI to 1MDB as a means of confidentially transmitting funds to a designated third party. On or about June 18, 2013, an additional amount of approximately $75.8 million was transferred from the 1MDB Global account to the Pacific Harbor Account. These two wires totalled approximately $126.3 million in diverted Project Catalyze bond proceeds.

135.   On or about June 20, 2013, the Pacific Harbor Account transferred approximately $75 million to the Affinity Equity Account described in Paragraph 121. As set forth in Paragraphs 121 and122, Affinity Equity appears to be a shell corporation

nominally affiliated with TAN that was used to funnel misappropriated 1MDB funds to LOW and his co-conspirators.

136.    On or about July 3, 2013, the Affinity Equity Account sent a wire transfer totaling approximately $65.1 million to a Hong Kong bank account (the "Capital Place Account") held by a BVI entity called Capital Place Holdings Ltd.  Owned by another co-conspirator of LOW's, the Capital Place Account was used to funnel misappropriated 1MDB funds to co-conspirators of Low.

137.    On or about July 19, 2013, the Capital Place Account sent a wire transfer totaling approximately $6 million to an account held by World Merit Management Ltd. at Bank of East Asia in Hong Kong (the "World Merit Account").

138.    Approximately three days later, on or about July 22, 2013, the World Merit Account transferred the entire $6 million received from the Capital Place Account to an account LOO beneficially owned at BSI Bank in Singapore in the name of Springbrook Global Limited ("Springbrook Global").  Corporate and bank records show that LOO incorporated Springbrook Global in the British Virgin Islands on or about March 8, 2013, and opened the Springbrook Global account at BSI Bank on or about April 3, 2013. There were no additional deposits into the Springbrook Global account apart from the $6 million received from the World Merit Account.

139.    On or about May 7, 2014, LOO transferred approximately $1.9 million from the Springbrook Global account to her personal account at BSI Bank in Singapore.

140.    On or about May 13, 2014, Christie's Auction House ("Christie's") in New York invoiced LOO for the purchase of the TROIS FEMMES NUES DRAWING.  The total sales price, including New York sales tax, was $1,377,268.75.

141.    On or about June 24, 2014, LOO transferred approximately $1,377,293 from her personal account at BSI Bank in Singapore to an account at Christie's to complete her purchase of the TROIS FEMMES NUES DRAWING.

**B.   LOO ESTABLISHED THE GLEN VINE ACCOUNT WITH FUNDS DIVERTED FROM THE 2014 DEUTSCHE BANK LOANS**

142.   In or about April 2015, LOO deposited approximately $1.25 million in misappropriated 1MDB funds traceable to the 2014 Deutsche Bank loans (as discussed above in Section V) into a Swiss bank account that she controlled.

143.   Corporate and bank records show that in or about October 2014, LOO incorporated an entity called Glen Vine Partners Limited ("Glen Vine Partners") in the British Virgin Islands.  LOO is the sole beneficial owner of Glen Vine Partners.  On or about November 20, 2014, LOO met with a representative of Falcon Bank in Switzerland and thereafter opened an account at Falcon Bank in the name of Glen Vine Partners (the "Falcon Glen Vine Account").

144.   On or about November 19, 2014, LOO received a wire for approximately $4.875 million from the Affinity Equity Account described above in Paragraphs 120 and 121 into an account she controlled at Falcon Bank in Switzerland held in the name of River Dee International SA (the "River Dee Account").  As set forth in Paragraphs 121 to 130, these funds are traceable to the proceeds of the Deutsche Bank loans from the Options Buyback phase of the conspiracy.  On approximately April 7, 2015, LOO transferred $1.25 million of these funds from the River Dee Account to the Falcon Glen Vine Account.  No other funds were deposited into the Falcon Glen Vine Account.

145.   In or about December 2020, as part of ONE Swiss Bank's acquisition of Falcon Bank, all of the funds and assets on deposit in the Falcon Glen Vine Account were transferred to a new account ending in 5470 in the name of Glen Vine Partners at ONE Swiss Bank, S.A., i.e., the GLEN VINE ACCOUNT.

146.   The GLEN VINE ACCOUNT's current balance is approximately $432,203.01.

## FIRST CLAIM FOR RELIEF
### (18 U.S.C. § 981(a)(1)(C))

147. Paragraphs 1 through 146 above are incorporated by reference as if fully set forth herein.

148. The DEFENDANT ASSETS are property that constitutes, and are derived from, proceeds traceable to one or more violations of: (i) a foreign offense involving the misappropriation of public funds by or for the benefit of a public official (18 U.S.C. § 1956(c)(7)(B)(iv)); (ii) wire fraud (18 U.S.C. § 1343); and (iii) international transportation or receipt of stolen or fraudulently obtained property (18 U.S.C. § 2314) and receipt of stolen money (18 U.S.C. § 2315), each of which is a specified unlawful activity under 18 U.S.C. §§ 1956(c)(7)(A), 1956(c)(7)(B)(iv) and 1956(c)(7)(D), and a conspiracy to commit such offenses.

149. The DEFENDANT ASSETS are therefore subject to forfeiture to the United States pursuant to 18 U.S.C. § 981(a)(1)(C).

## SECOND CLAIM FOR RELIEF
### (18 U.S.C. § 981(a)(1)(A))

150. Paragraphs 1 through 149 above are incorporated by reference as if fully set forth herein.

151. The DEFENDANT ASSETS are traceable to property involved in one or more transactions or attempted transactions in violation of 18 U.S.C. § 1957 and a conspiracy to commit such offenses in violation of 18 U.S.C. § 1956(h). Specifically, the DEFENDANT ASSETS are traceable to property involved in one or more monetary transactions, attempted transactions, and a conspiracy to conduct or attempt to conduct such transactions in criminally derived property of a value greater than $10,000 that was derived from specified unlawful activities, that is: (i) a foreign offense involving the misappropriation of public funds by or for the benefit of a public official (18 U.S.C. § 1956(c)(7)(B)(iv)); (ii) wire fraud (18 U.S.C. § 1343); and (iii) international transportation or receipt of stolen or fraudulently obtained property (18 U.S.C. § 2314) and receipt of stolen money (18 U.S.C. § 2315).

152.   The DEFENDANT ASSETS are therefore subject to forfeiture pursuant to 18 U.S.C. § 981(a)(1)(A).

## THIRD CLAIM FOR RELIEF
### (18 U.S.C. § 981(a)(1)(A))

153.   Paragraphs 1 through 152 above are incorporated by reference as if fully set forth herein.

154.   The DEFENDANT ASSETS are traceable to property involved in one or more transactions, or attempted transactions in violation of 18 U.S.C. § 1956(a)(1)(B)(i) and a conspiracy to commit such offenses in violation of 18 U.S.C. § 1956(h). Specifically, the DEFENDANT ASSETS are traceable to property involved in one or more financial transactions, attempted transactions, and a conspiracy to conduct or attempt to conduct such transactions involving the proceeds of specified unlawful activity, that is: (i) a foreign offense involving the misappropriation of public funds by or for the benefit of a public official (18 U.S.C. § 1956(c)(7)(B)(iv)); (ii) wire fraud (18 U.S.C. § 1343); and (iii) international transportation or receipt of stolen or fraudulently obtained property (18 U.S.C. § 2314) and receipt of stolen money (18 U.S.C. § 2315), and were designed in whole or in part to conceal or disguise the nature, the location, the source, the ownership or the control of the proceeds of the specified unlawful activities in violation of 18 U.S.C. § 1956(a)(1)(B)(i).

155.   The DEFENDANT ASSETS are therefore subject to forfeiture pursuant to 18 U.S.C. § 981(a)(1)(A).

WHEREFORE, plaintiff United States of America prays that:

(a)   due process issue to enforce the forfeiture of the DEFENDANT ASSETS;

(b)   due notice be given to all interested parties to appear and show cause why forfeiture should not be decreed;

(c)   this Court decree forfeiture of the DEFENDANT ASSETS to the United States of America for disposition according to law; and

1         (d)   for such other and further relief as this Court may deem just and proper,

2    together with the costs and disbursements of this action.

3

4    Dated: August 28, 2023          Respectfully submitted,

5                               MARGARET A. MOESER

6                               Acting Chief, Money Laundering and Asset
                           Recovery Section

7                               Criminal Division
                           U.S. Department of Justice

8

9                                 /s/ *Sean M. Fern*
                           _____

10                              JONATHAN BAUM
                           BARBARA Y. LEVY

11                              JOSHUA L. SOHN (CBN: 250105)
                           SEAN M. FERN

12                              Trial Attorneys

13

14                              Attorneys for Plaintiff

15                              UNITED STATES OF AMERICA

16

17

18

19

20

21

22

23

24

25

26

27

28

1

## **VERIFICATION**

2

3        I, Ryan Collins, hereby verify and declare under penalty of perjury that I am a

4    Special Agent with the Federal Bureau of Investigation, that I have read the foregoing

5    Verified Complaint for Forfeiture *In Rem* and know the contents thereof, and that the

6    matters contained in the Verified Complaint are true to the best of my knowledge and

7    belief.

8        The sources of my knowledge and information and the grounds of my belief are

9    official files and records of the United States, publicly available files and historical

10   information, information supplied to me by other law enforcement officers, experts, and

11   other witnesses, as well as my investigation in this case, together with others, as a

12   Special Agent of the Federal Bureau of Investigation.

13       I hereby declare under penalty of perjury that the foregoing is true and correct.

14

15   Executed this 23 day of August , 2023, at New York, NY .

16

17

18   _____

19   Ryan D. Collins
     Special Agent
20   Federal Bureau of Investigation

21

22

23

24

25

26

27

28

46